ST. LOUIS SOUTHWESTERN RY. CO. OF
TEXAS v. SMITHHART. (No. 1698.)

Court of Civil Appeals of Texas. Beaumont.
June 19, 1928.

Marsh & McIlwaine, of Tyler, and Mantooth & Denman, of Lufkin, for appellant.

S. P. Jones, of Marshall, for appellee.

WALKER, J. Appellant has made the following statement of the nature and result of this suit:

"While Lee Roy Smithhard, a section hand in the service of appellant, was riding upon one of its section cars that was being pushed along the track by a motorcar operated by the section foreman under whom he worked, the car upon which he was riding was derailed, and having been by the derailment thrown in front of the motorcar he was run over by it and received severe injuries. He instituted this suit in the district court of Angelina county against appellant, St. Louis Southwestern Railway Company of Texas, to recover damages for the personal injuries so received by him. After the institution of the suit he died from the injuries. and his father, the appellee, R. C. Smithhart, having been appointed administrator of his estate, made himself a party and sought to recover of appellant the damages he sustained as the father of deceased, the mother being dead, by reason of the death of his son, as well as the damages sustained by his son incident to the physical pain and suffering endured by him prior to his death. The grounds upon which he sought a recovery were that appellant was guilty of negligence (1) in furnishing for the use of decedent a push car that was aged, worn, and defective and otherwise unsafe; (2) in that.

the foreman attempted and endeavored to shove the push car over the track ahead of the motorcar, when he should have placed the push car behind the motorcar, to be pulled by it; (3) in that improper appliances and devices were furnished and used to couple the cars together; (4) in that the motorcar and push car were operated over the track at a dangerously high rate of speed; and (5) in that the foreman negligently failed to stop the motorcar, so as to prevent running over decedent after the push car had been derailed.

"Appellant in its amended answer pleaded (1) a general denial; and (2) that deceased was an experienced section hand, and when injured was engaged in interstate commerce, in which appellant was also engaged, and, knowing the danger incident thereto, he assumed the risk (a) in riding on the push car, knowing that it was not pulled, but pushed, by the motorcar; (b) in riding on and working with the cars, knowing the manner in which they were coupled together; and (c) in riding on the push car, knowing the speed at which the cars were being operated."

The issue that the push car was defective was not submitted to the jury. The other issues were submitted in the form of questions, to which the jury answered that appellant was:

(1) (a) Negligent in operating the push car ahead of the motorcar at the time and place of the accident; (b) and such negligence was the proximate cause of the injury to Lee Roy Smithhard.

(2) (a) The speed at which the motor car was being run at the time of the derailment was negligence; (b) and such negligence was a proximate cause of the injury to Lee Roy Smithhard.

(3) (a) The failure of the foreman to stop the car before Smithhard was injured constituted negligence; (b) and such negligence was a proximate cause of the injury to Smithhard.

(4) The deceased did not assume the risks resulting in his injury.

(5) As a proximate result of his injuries up to the time of his death, Lee Roy Smithhard sustained damages in the sum of $10,000, and appellee sustained damages in his personal capacity in the sum of $1,000.

On this verdict, judgment was entered in favor of appellee against appellant for the sum of $11,000. Appellant has duly prosecuted its appeal from that judgment.

Appellant raises the propositions: (a) The court erred in refusing to instruct a verdict in its favor on the ground that the evidence did not raise the issues submitted; (b) the findings of the jury in response to the issues were so against the overwhelming weight of the evidence as to be clearly wrong; (c) the deceased assumed the risks resulting in his injury; and (d) misconduct of the jury.

The issues submitted to the jury were not only raised by the evidence, but the verdict was fully sustained. As the case must be reversed on the misconduct of the jury, we give only a brief statement of the evidence on the issues submitted.

Smithhard was employed as a section hand at the time of his injury, working for appellant under the section foreman, Charlie Crosby, who was his brother-in-law. Crosby had the authority and directed the manner of operating the push car and the motorcar, and the placing of the push car ahead of the motorcar. He also had authority in placing his section hands on these cars, and either directed or permitted Lee Roy Smithhard and another one of his section hands to ride on the push car. The other section hands rode with him on the motorcar. The foreman was operating the motorcar at the time of the derailment, and as foreman and operator directed its speed. Operating the push car ahead of the motorcar was dangerous, and the instance in question was the first time the push car had been operated ahead of the motorcar, with the engine running, on this section. There was no evidence that Lee Roy Smithhard had ever seen or knew of the push car being so operated before, or knew of the danger of such operation. While on other sections it was customary to operate the push car ahead of the motorcar, it was recognized as dangerous, and the usual speed for such operation was 4 or 5 miles per hour. The witnesses varied in their estimates of the speed at which the motorcar was being operated at the time of the derailment. Some placed it as low as 5 or 10 miles an hour, while there was testimony to the effect that it was as high as 20 miles per hour. It was the rule of the company not to run over 15 miles per hour with the motorcar on a straight track. The foreman testified that he saw the push car, and was looking at it at the time it was derailed. There was testimony to the effect that the push car ran as far as 26 feet after its derailment before Lee Roy Smithhard fell off between it and the motorcar, and that the motorcar ran 16 feet after running over the body of Smithhard. At a speed of 8 to 10 miles per hour, running by itself, the motorcar could be stopped within a distance of 20 or 30 feet. When retarded by the push car, it could be stopped in a shorter distance, and, propelling the derailed push car, it could have been stopped in a much shorter distance. There was testimony to the effect that the foreman never applied the brakes to stop the motorcar, and that the engine was running at the time it was derailed, after passing over the body of Smithhard. We believe this short summary of the evidence is sufficient to raise the issues of negligence submitted to the jury.

The trial court can take the questions of negligence from the jury only in those cases where there is no room for ordinary minds to differ as to the conclusions to be drawn from the evidence as a whole. Lee v. Railway Company, 89 Tex. 583, 36 S. W. 63; Choate v. Railway Company, 91 Tex. 406, 44 S. W. 69.

In Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059, the rule was announced that the trial court should instruct a verdict, even though there be slight testimony in favor of the plaintiff "if its probative force be so weak that it only raises a mere surmise or suspicion of the existence of the facts sought to be established, such testimony in legal contemplation falling short of being 'any evidence'; and (2) that it is the duty of the court to determine whether the testimony has more than that degree of probative force." That case is authority for the proposition that the "scintilla rule" is not the law in this state, but, on the contrary, there must be "substantive evidence" to sustain a verdict before the court is authorized to send it to the jury. But even those cases, without conflict in the evidence, should go to the jury where the testimony "discloses a variety of circumstances from which different minds may reasonably arrive at different conclusions as to the ultimate fact shown by such evidence." Hickman v. State Life Insurance Company, 92 Ohio St. 87, 110 N. E. 542; Bragg v. Houston Electric Company (Tex. Civ. App.) 264 S. W. 245.

Applying these principles to the facts of this case, many circumstances were shown surrounding and explaining the cause of the injury to Lee Roy Smithhard. All these circumstances had to be weighed by the jury in determining the issues of negligence. These circumstances constituted more than a "scintilla" of evidence on the issues submitted. In operating the car more than 15 miles per hour, the section foreman was violating the rules of his company, thereby raising against him the issue of negligence. In operating with a push car at more than 4 or 5 miles per hour, he was violating an established custom for the operation of the push car in front of the motorcar, thereby raising against him the issue of negligence. Since he admitted that he saw the push car when it was derailed, and the evidence raised the issue that he failed to apply the brakes on the motorcar and to stop the engine, there was raised against him the issue of negligence in this respect.

But, if negligence be conceded, appellant says that the issue of proximate cause was not raised. Proximate cause was an essential element of plaintiff's recovery, as much so as negligence itself, since, unless the injury proximately resulted from the negligence alleged, appellant was not liable. On the facts disclosed, the jury were authorized to find that the failure to apply the brakes was a proximate cause of the injury, since, had the brakes been applied, the issue was raised that the section foreman could have stopped the motorcar before running over Smithhard; also, the jury was authorized to find that the derailment proximately resulted from the excessive rate of speed; also, the jury was authorized to find that Lee Roy Smithhard's injury proximately resulted

from the negligence in operating the push car ahead of the motorcar. The evidence not only raised these issues, but abundantly supported the jury's verdict. The trial court did not err in refusing to sustain as a matter of law appellant's plea of assumed risk. Smithhard did not assume the risk of the section foreman's negligence in operating his car at a dangerous rate of speed, since it was not shown that he knew that the car would be so operated when he took his place upon the push car, nor was it shown that at the time the car was being so operated he could, with safety, have jumped from the motorcar. Certainly he did not assume, as a matter of law, the risk of the section foreman's negligence in failing to stop the engine and apply the brakes on the motorcar after the derailment of the push car. It not being shown that he knew of the danger of operating the push car in front of the motorcar, he did not assume that risk. All of appellant's assignments and propositions, based upon its requested peremptory instruction and in the refusal of the court to set the verdict aside as being without support, are overruled.

Under the more recent decisions by the Supreme Court and the Commission of Appeals, expressly approved by the Supreme Court, the jury was guilty of misconduct while it was deliberating upon its verdict, which constitutes reversible error. J. R. Nelson, one of the jurors who tried this case testified:

"There was something said in the jury room, while the jurors were deliberating on their verdict, as to the amount that would probably have to be paid by plaintiff to his lawyers as compensation for representing him in this case. There was some one of the bunch—I do not recollect just what man it was—asked me—He was talking to me, and asked me, 'Do you know the amount, or sum, the attorneys will get out of the amount?' and I told him that I didn't; I didn't have any idea. 'Well,' he says, 'I think they are getting about half;' and I told him I didn't know what they were getting. Of course, I knew they were not working free of charge. I was in favor of a verdict for $3,000 at the start. There were other jurors, as I recollect it, who favored awarding him $3,000 at the beginning; one was Mr. Courtney, and Mr. Athey, and another gentleman; I did not learn his name—another man about the size of Mr. Courtney. I suppose it was along about 11 or 12 o'clock that night that the statement was made that the plaintiff would have to pay perhaps half of the amount awarded as compensation to his lawyers; I do not recollect just the hour, but it was late in the night. I agreed to the verdict that was finally rendered. As to whether the statement made in the jury room respecting the amount that the attorneys would get of the recovery did, or did not, influence me in agreeing to the verdict that was finally turned in by the jury, I will say not altogether it didn't. As to what effect this discussion or statement by some of the jurors respecting the amount that the attorneys would get had on me, I will say, well,

it did not have very much effect on me, as far as that is concerned. It just had the effect, now—I went to $11,000 in order to get—so Mr. Smithhard could get a little money to pay for all, to reimburse him for his expenses and so on, and his trips to Texarkana and paying sanitarium bills at Lufkin, and everything. Had this discussion not taken place, I would not have agreed to the verdict that I did for $11,000, because I did not figure that he deserved $11,000 for his individual part. The reason I agreed to give $11,000 clear of attorney's fees."

Cross-examination: "I do not recollect just who the gentleman was that mentioned attorney's fees in my presence; there was a couple of them. They did not tell me that they knew; they did not say for certain, but they said they understood that attorneys in cases like that got half; that they had always been told that. They did not claim to have any knowledge. That was while we were all in the jury room. When they told me that, I said I did not know what the lawyers were getting. I say now that I assumed that the lawyers were not working for nothing. I told him that. That occurred Friday night—on the night that we were out. I do not recollect just what hour I agreed to the verdict for $11,000, it was some time in the morning, though, before noon."

The jurors Berry and Vaughn testified that they were present while the jury was deliberating upon the facts of the case, trying to determine the amount of the verdict, and that they did not hear the question of attorney's fees mentioned, and that it was not discussed to any extent in their presence. Vaughn testified that he was in favor of a $10,000 verdict at first, and finally agreed to the $11,000 verdict.

On that point, when the jurors began their deliberations, their estimates of appellee's damages ranged from $3,000 to $35,000. Juror Crager testified that during the deliberations some one mentioned attorney's fees, but in that connection another juror said that this was a matter not to be discussed, that it was not in the case, and that this was the first and last he heard of the issue. The juror Athey could not be positive that he heard the issue discussed. Some one might have spoken about it, but, if it was discussed, it had nothing to do with his verdict. Juror Stubblefield said that the issue was mentioned two or three different times, but he told his fellow jurors it was none of their business what the attorneys got; whether they got $100 or all of it, it was not an issue to be discussed by them. The juror Hammer testified that he remembered hearing some discussion of attorney's fees, but did not know who indulged in the discussion, and did not remember what was said. The juror McCarty testified that somebody mentioned that the lawyers would get half, and he spoke up and said that wasn't any of their business what the attorneys got, that they couldn't consider that at all, and he never heard anything else mentioned about it. The juror Simmons said

that some one said something about attorney's fees. He did not remember what was said, there wasn't much said about it; that when the man mentioned it some one told him it did not make any difference, that it was not to be considered. This juror said he did not consider the issue in reaching his verdict. The juror Courtney testified that some one in the jury room said, "I wonder what the lawyers get out of this, one-third?" and some one spoke up and said, "We haven't got nothing to do with that," and there was nothing else said about it that he knew of; that some one said, "Let's get on with the case." This discussion occurred when the jury first retired, and before they had done anything with their verdict.

The case was tried by 12 jurors, and the other 2 were not offered in evidence, as they were not within the jurisdiction of the court at the time of the hearing on this issue. After a full hearing, the trial court overruled the motion for new trial, but filed no conclusions of law or fact in support of its judgment thereon. Appellee says:

"It is therefore conclusive that the trial court found against there being any mention of attorney's fees, or other misconduct on the part of the jury before which this cause was tried, and likewise found against any juror being improperly influenced in reaching the verdict. The only juror whose testimony on the motion for new trial would in any wise raise the issue of misconduct was J. R. Nelson."

In view of the evidence before the trial court, we cannot agree with appellee that the trial court found, or would have so found, had the request been made, that there was not any mention made of attorney's fees by the jury in its deliberations and before it reached its verdict. Such a finding would have been so against the weight of the testimony heard by the trial court as to be without support. We must conclude that the issue of attorney's fees was discussed by the jury before reaching its verdict, and, the juror Stubblefield not having been impeached, that this issue was discussed once, possibly twice, possibly three times, before the verdict was reached. Appellee is correct in saying that the trial court concluded that no juror was improperly influenced in reaching his verdict, by this discussion. For the jury to discuss attorney's fees as this jury did, while discussing the amount of damages to be assessed against the defendant, is a flagrant wrong, for which there is no excuse. This has happened so many times, judging by the reported decisions of this state, that a juror of average intelligence must know, even from common experience, that such conduct not only constitutes an impropriety, but a gross and flagrant wrong. But it seems to be one of those recurring injuries that our trial procedure is not able to prevent. Appellee suggests that the construction now being placed

by the Supreme Court upon such conduct will finally result in the repeal of the statute authorizing and sustaining this inquiry. It is to be hoped that this fear on the part of appellee's able counsel is not well founded. This statute, being article 2234, serves an important office in protecting the rights of litigants.

As we construe the latest expressions from our Supreme Court, the issue raised by appellant's proposition of misconduct is one of law, and not of fact. Bell v. Blackwell (Tex. Com. App.) 283 S. W. 765; Hines v. Parry (Tex. Com. App.) 238 S. W. 886. But the trial court, even under these later decisions, still rests under the burden of determining the facts deduced from such a hearing, and his conclusions of fact on this issue, as on all other issues, can be disturbed by the appellate court only when without support in the evidence, or when so against the overwhelming weight of the evidence as to be clearly wrong. Bradley v. Railway (Tex. Com. App.) 1 S.W.(2d) 861. Having determined the facts, of course, it becomes the duty of the trial court to announce the law of such facts, by either granting a new trial or overruling the motion for a new trial. The trial court's conclusions of law on such facts are subject to review by the appellate court, as are the conclusions of law on other facts. If, under the decisions announcing the law, the trial court has improperly construed the facts, it becomes the duty of the appellate court to reverse its judgment. Where misconduct has been shown, as in this case, the law presumes injury. Upon such a showing, as a matter of law, the complaining party is entitled to a new trial, unless it appears beyond a reasonable doubt that injury was not shown.

If there is a reasonable doubt as to the effect of the misconduct, the trial court should grant a new trial, and, should that relief be refused in the lower court, it becomes the appellate court's duty to reverse the trial court's judgment. On the facts in this case, it occurs to us that injury was affirmatively shown. The juror Nelson testified positively that he did consider the question of attorney's fees in rendering his verdict. The mental process of this juror became a legitimate subject of inquiry, in view of the overt act shown by the discussion of the question of attorney's fees. Bradley v. Railway, supra. But, had Nelson been in doubt, still his doubt would have constituted injury. In Southern Traction Co. v. Wilson, 254 S. W. 1104, the Commission of Appeals, with express approval of the Supreme Court, said:

"A reading of the entire record leads almost to the conclusion that the juror was improperly influenced. At any rate, he himself was uncertain about it. So are we. It is reasonably doubtful, to say the least of it, whether he was influenced or not by these extraneous matters in arriving at the amount of the verdict he was willing to award. The case should be reversed."

In that case the reasonable doubt in the minds of the Commission of Appeals was resolved against the ruling of the trial court and held reversible error. That case, together with many of the later cases, was cited with approval by the Commission of Appeals in the very late case of St. Louis Southwestern R. Co. v. Lewis, 5 S.W.(2d) 765, where it was said:

"It being shown by the testimony of at least eight or nine of the jurors that the matters of an offer in compromise and attorney's fees were mentioned and discussed by at least several members of the jury prior to the time that the jury had agreed upon the amount of the verdict, and the testimony of the juror King being reasonably susceptible of the legal construction that he is merely testifying that he did not hear such discussions until all the jury, except one, had agreed that the verdict should be for $8,500, and that this juror thought the verdict should be $10,000, a new trial should have been granted. It was certainly flagrantly wrong for the jury or any member thereof to mention or discuss the fact or report that the railway company had offered Lewis $5,000 in compromise, and it was also flagrantly wrong for the jury or any member thereof to mention or discuss the fact that Lewis had to pay his attorneys out of his recovery. The discussion of these matters is, as a matter of law, calculated to injure the railway company. Under this state of the record, the trial court should have granted a new trial."

Moore v. Ivey (Tex. Com. App.) 277 S. W. 106, seems to be exactly in point upon the facts of this case in its most important aspect. Before the discussion the juror Nelson was in favor of only $3,000. After the discussion he raised his verdict to $11,000, giving as a reason that he wanted to protect appellee against the cost of attorney's fees and other items of expense, so that appellee might have net to him at least the $3,000. Three other jurors before the discussion were in favor of only $3,000. After this discussion they raised their verdict to $11,000. One of them explained his verdict by saying that he suggested $3,000 only as a working basis. There was no explanation as to this very large increase in the verdict of the other two. Certainly these facts raise a reasonable doubt as to the influence of this discussion upon their verdict. On similar facts, this was the argument in Moore v. Ivey, supra. This doubt must be resolved against the trial court's judgment.

Appellee cites Bradley v. Railway, supra, where the Commission of Appeals held:

"The trial courts should permit no inquiry into the mental processes or calculations of a juror in arriving at his verdict until such inquiry is made necessary to determine the effect on a juror's mind of some proven overt act of misconduct."

In that case no overt act was shown, but one of the jurors testified that, though the question of attorney's fees was not mentioned in the jury room, he—

"felt that it would take that [attorney's fees] to compensate him for the condition he was in, and the lack of ability to earn money, and the suffering he had gone through. * * * My idea was to compensate the plaintiff for the damages he had sustained, and, as I said, I knew that the attorneys would get something."

Holding that this testimony did not constitute an overt act, the Commission of Appeals concluded it did not constitute reversible error.

Appellee is correct in saying that the mere mention of attorney's fees does not constitute reversible error. Bradley v. Railway, supra; Ft. Worth & D. C. R. Co. v. Smithers (Tex. Civ. App.) 228 S. W. 637; Southern Traction Co. v. Wilson, supra. But under the decisions the mere mention of attorney's fees is a violation of the rights of the parties litigant, and, when that fact has been shown, constitutes reversible error, unless it appears beyond a reasonable doubt that no injury resulted therefrom.

This last proposition, we think, is the clear holding in the recent decisions of the Commission of Appeals cited above. We have indulged in this extended discussion of the injury growing out of the discussion of attorney's fees, in answer to the urgent insistence of able counsel for appellee that no injury was shown. They reviewed, not only the recent decisions cited by us, but also the older decisions, holding that such misconduct constituted reversible error only upon an affirmative showing of injury, citing Ft. Worth & D. C. R. Co. v. Smithers (Tex. Civ. App.) 228 S. W. 637, and West Lumber Company v. Tomme (Tex. Civ. App.) 203 S. W. 784, where this court said, discussing attorney's fees, that such discussion—

"would not be sufficient to warrant this court in reversing the judgment, unless this court can say from the record that the trial court abused its discretion in denying a new trial on this ground."

That the complaining party was required to show affirmatively that he had been injured by reason of the misconduct may have been the rule under the decisions reviewed by appellee, but, if we correctly understand the current holdings of the Supreme Court, that is not the rule now.

For the misconduct of the jury discussed, the judgment of the trial court is reversed, and this cause remanded for a new trial.